## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MVCONNECT, LLC, an Illinois Limited Liability Company and RECOVERY MANAGER PRO, LLC, a Delaware Limited Liability Company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:10-cv-1948F |
| v. | ) ) | JUDGE ROYAL FERGUSON |
| RECOVERY DATABASE NETWORK, INC., a Delaware corporation, DIGITAL RECOGNITION NETWORK, INC., a Delaware corporation, TODD HODNETT, and JOHNNIE CORT DEHART, | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR
## ANTITRUST VIOLATIONS AND CIVIL CONSPIRACY

Plaintiffs MVCONNECT, LLC ("MV") and Recovery Manager Pro, LLC ("RMP"), hereby file their Amended Complaint for Antitrust Violations and Civil Conspiracy against defendants Recovery Database Network, Inc. ("RDN"), Digital Recognition Network, Inc. ("DRN"), Todd Hodnett ("Hodnett"), and Johnnie Cort Dehart ("Dehart"). Plaintiffs seek damages, injunctive and other relief for defendants' wrongful and anticompetitive acts.

### NATURE OF THE ACTION

1.      Since at least 2007, DRN and RDN—businesses in the automotive recovery industry—have conspired to harm their competitors in the markets for two important automotive recovery tools: Recovery Databases and Automotive License Plate Recognition Technology. Defendants' wrongful and malicious conspiracy aims to restrain, and has restrained, trade in

those markets to ensure that RDN and DRN remain the dominant firms.  Their conspiracy has impeded plaintiffs' ability to compete fairly in those markets, causing plaintiffs to lose millions of dollars in existing and prospective business, and irreparably damaging plaintiffs' reputation and goodwill, and has had a detrimental and anti-competitive effect on consumers in those markets.

## JURISDICTION AND VENUE

2.      Counts I, II, III and IV of the Amended Complaint are brought pursuant to Sections 1 and 2 of the Sherman Act (15 U. S. C. §§ 1, 2) and Section 4 of the Clayton Act (15 U. S. C. § 14), for violations of antitrust laws of the United States.  The jurisdiction of this Court over Counts I, II, and III is founded on those sections and on 28 U.S.C. § 1331, which provides the Court with original jurisdiction over actions arising under the laws of the United States, and on 28 U. S. C. § 1337, which provides the Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.  All parties to this lawsuit sell their products in interstate commerce as that term is defined in the relevant case law.

3.      Counts V, VI, VII, VIII, and IX of the Amended Complaint are common law claims for civil conspiracy, tortious interference with contract, and tortious interference with prospective business relationships.  The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiffs on the one hand and defendants on the other hand, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  In addition, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, given that Counts I, II, and III assert related claims that arise under the laws of the United States and all claims alleged herein form part of the same case or controversy.

2

4.       This Court has personal jurisdiction over defendants RDN and DRN because both companies transact substantial business in the state of Texas, and DRN has its principal place of business in the state of Texas.  This Court has personal jurisdiction over defendants Hodnett and Dehart because, on information and belief, they each reside and/or do substantial business in Dallas, Texas.

5.       Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 and 15 U. S. C. §§ 15 and 22 because the defendants reside and/or transact substantial business in this district.

## AUTOMOTIVE RECOVERY

6.       Many financial institutions in the United States provide auto financing, *i.e.* they loan money to people who want to buy cars.  Those loans typically result in the financial institution's assumption of a security interest in the car that the borrower purchases.  If the borrower fails to make payments on the loan, the financial institution will often endeavor to repossess the car.  One difficulty inherent to this type of collateral repossession is, of course, that cars are mobile.  In order to recover the car, the financial institution first has to find it.  That challenge has given rise to the automotive recovery industry.

7.       The automotive recovery industry in the United States serves auto-finance companies and other lien-holders, as well as law enforcement agencies and other organizations that require assistance in locating and recovering missing vehicles (collectively, "Organizations").  Organizations hire repossession agents ("Agents") to assist them in locating and/or recovering vehicles that are either reported as stolen or serve as collateral for defaulted loans (collectively, "Vehicles of Interest").

8.     For many decades, Agents located and repossessed Vehicles of Interest primarily through investigating the debtor-driver and/or last driver of record for each vehicle (such investigations are sometimes referred to as "skip tracing," from the idiom "to skip town") and then searching for the vehicle in places where the driver was known to have traveled.  Agents would keep their own internal records regarding the information gathered about each Vehicle of Interest and the progress of each repossession effort, communicating periodically with the Organizations for which they worked.  Each Organization's management of its relationships with Agents, and its tracking of the repossession process with respect to Vehicles of Interest, was for many years a very cumbersome and expensive endeavor.

9.     In recent years, two new products have fundamentally changed the manner in which Agents and Organizations do business.  These products are Recovery Databases and Automated License Plate Recognition Technology, both of which are relevant antitrust markets for purposes of this Amended Complaint and are described in greater detail below.

**RECOVERY DATABASE MARKET**

10.     Recovery Databases are secure on-line networks, hosted and controlled by outside providers, and used by Organizations and Agents to store and manage data concerning Vehicles of Interest.  Both Organizations and Agents pay fees to Recovery Database providers for access to and use of the providers' respective Recovery Databases, sometimes on a flat-fee basis, and sometimes on a per-vehicle basis.  Plaintiff RMP and defendant RDN are providers of Recovery Databases within the Recovery Database Market.

11.     An Organization typically chooses one Recovery Database to store and organize information about all Vehicles of Interest that it has assigned to Agents for repossession (each assignment is an "Account").  Organizations then require their Agents to subscribe to that

Recovery Database and use it on a regular basis to (i) access information concerning each Account (such as the make and model of the car, its vehicle identification number, last known license plate, etc); and (ii) communicate with the Organization concerning the Agent's ongoing repossession efforts and progress.

12.     Agents who do not subscribe to an Organization's Recovery Database of choice, or who do not follow the Organization's standard protocols for entering Account information into that Recovery Database, often will not receive business from that Organization.

13.     Because Agents are often required to use an Organization's Recovery Database of choice in order to receive Accounts from that Organization, Agents typically subscribe to the Recovery Database to which their Organization-clients have subscribed.   Therefore, the profitability of any Recovery Database provider within the Recovery Database Market is dependent upon its ability to attract Organization-clients with large inventories of Vehicles of Interest (*e.g.*, Chase Automotive Financial ("Chase"), Capital One, AmeriCredit, etc.) who in turn will require large numbers of Agents to subscribe to that Recovery Database in order to accept and process Accounts.

14.     Recovery Databases constitute a relevant antitrust market in this case. They are not reasonably interchangeable with other products and services used in the automotive recovery industry.  No other product or service used for this purpose can amass and manage the quantity of data that Recovery Databases can.  Nor can any other search method or product keep track of Agent activity or facilitate Agent/Organization communication as effectively as Recovery Databases do.  No other product or service allows for mass automated searching of vehicle data the way that Recovery Databases do. In the automotive recovery industry, there are no meaningful substitutes for Recovery Databases.

15.     The demand for Recovery Databases is inelastic.   If the price of utilizing Recovery Databases were to rise by a small but significant amount, consumers would not forgo their use of Recovery Databases in favor of other repossession products or services.

16.     The Recovery Database Market is nationwide in scope.   Lenders offer loans on Vehicles of Interest throughout the continental United States and borrowers can drive Vehicles of Interest anywhere within the continental United States.   Recovery Databases are designed to account for these facts, and must account for them, if they are to be useful to Organizations and Agents that manage Accounts originating across the United States.

**ALPR TECHNOLOGY MARKET**

17.     Automated License Plate Recognition Technology ("ALPR Technology") generally consists of a system of cameras mounted on an Agent's vehicle that (i) capture license plate images on vehicles in the surrounding area; (ii) interact with image manipulation software to convert the license plate images to text; and (iii) transmit the license plate data to a web-enabled lap top located inside the Agent's vehicle (an "ALPR System").   As an Agent drives on the open road or through parking lots, the cameras capture and record the license plates of each vehicle they pass, collecting exponentially more data, and with greater accuracy, than is possible with the human eye ("ALPR Data").   The ALPR System then analyzes and compares the ALPR Data it has collected against the inventory of Vehicles of Interest in one or more Recovery Database(s) to determine if there is a "Hit," *i.e.* a match with a Vehicle of Interest.   Plaintiff MV and defendant DRN are providers of ALPR Systems in the ALPR Technology Market.

18.     In addition to identifying Vehicles of Interest, ALPR Systems also store the ALPR Data.   That ALPR Data is available for subsequent use in locating and/or repossessing automobiles that become Vehicles of Interest at a later date.   The collection of ALPR Data is a

valuable recovery tool because, as automobiles become Vehicles of Interest, information about when and where those vehicles were spotted on prior occasions indicates when and where those Vehicles of Interest are most likely to reappear.

19.     Agents are consumers of ALPR Technology. They purchase or lease ALPR Systems from an ALPR System provider.  The provider then links the ALPR System to one or more Recovery Databases that it operates or is affiliated with.  Agents then use the ALPR Systems to locate Vehicles of Interest for repossession.

20.     Organizations are also consumers of ALPR Technology.  Organizations do not purchase or lease the ALPR Systems themselves; rather, they purchase Hits from ALPR System providers for the purpose of passing along those Hits to their Agents for use in the repossession process.  In addition, Organizations sometimes assign Accounts directly to ALPR System providers.  The ALPR System provider then searches for the Vehicles of Interest associated with those Accounts through the ALPR Systems operated by its Agents.

21.     ALPR Technology constitutes a relevant antitrust market because it is not reasonably interchangeable with other products and services used in the automotive recovery industry.  Unlike traditional repossession methods, such as skip tracing, ALPR Systems do not target last-known drivers and do not involve manual or interpersonal investigation.  Instead, ALPR Systems function through a passive, automated and computerized process of mass data comparison, which enables Agents to locate and repossess Vehicles of Interest faster, more efficiently, and with greater frequency than is possible through any other means available.

22.     Moreover, ALPR Technology constitutes a relevant antitrust market because consumers do not regard ALPR Technology as reasonably interchangeable with other goods and services available to them in the automotive recovery industry.  Rather, consumers view ALPR

7

Technology as complementary to traditional repossession methods. DRN's own marketing materials concede that point, explaining that, while skip tracing has its place in the recovery process, Agents and Organizations can vastly improve their success rates by adding ALPR Technology to their arsenal of repossession tools.

23.     In other words, ALPR Technology does not replace conventional repossession methods but instead is a unique recovery tool which, when used *in tandem* with conventional methods, will allow Agents to (i) locate and repossess Vehicles of Interest that they otherwise would not have found; and (ii) increase the speed, efficiency and frequency with which they complete the repossession process.

24.     ALPR Technology constitutes a relevant market also because demand for ALPR Technology is inelastic. If the price of ALPR Systems were to rise by a small but significant amount, consumers would not switch from ALPR Systems to other repossession products or services, because there are no viable alternatives available.

25.     For the same reasons as alleged in paragraph 16 above, the ALPR Technology Market is nationwide in scope. Organizations and Agents across and throughout the United States use ALPR Technology to locate Vehicles of Interest across and throughout the United States.

## THE PARTIES

**RECOVERY MANAGER PRO, LLC (PLAINTIFF)**

26.     RMP is a Delaware limited liability company with its principal place of business in Palatine, Illinois. RMP has two members: (i) plaintiff MVCONNECT, LLC ("MV"); and (ii) Florida Database Technologies, LLC. MV is the majority owner and managing-member of RMP, and its sole member, Scott Jackson, resides in and is a citizen of Illinois. Florida Database

Technologies, LLC has two members, Patrick Wren and Kenneth Bradley, both of whom reside in and are citizens of Florida.

27.     RMP provides a Recovery Database to Organizations and Agents in the Recovery Database Market (the "RMP Database").

**MVCONNECT, LLC (PLAINTIFF)**

28.     Plaintiff MV is an Illinois limited liability company with its principal place of business in Palatine, Illinois.  MV is composed of three divisions.

29.     Two divisions of MV, MVRecovery (previously known as City Auto Recovery Service or "CARS") and MVIntel (previously known as International Intelligence Agency, LLC or "IIA, LLC," and now also known as MVCONNECT, LLC) seek to recover Vehicles of Interest in the greater Chicago area, in other states, and internationally.   In addition, MVRecovery manages the recovery of Vehicles of Interest nationwide through a network of Agents who work for MV as independent contractors.  MVRecovery and MVIntel are consumers in the Recovery Database Market.

30.     The third division of MV, MVTRAC, is an ALPR System provider in the ALPR Technology Market.

31.     MVTRAC's ALPR System works in the following manner: via a secure, encrypted electronic data process, Organizations upload information concerning Vehicles of Interest to the RMP Database.  MVTRAC then distributes this information across its national system (the "Network") of mobile ALPR Systems ("MV Kits"), each of which consists of multiple cameras mounted to the outside of a vehicle and linked to a web-enabled laptop and printer installed inside the vehicle.   MV Kits are operated by Agents who have become MVTRAC subscribers ("Subscriber-Agents"), and pay a monthly fee to use the MV Kits, which

MVTRAC installs on their vehicles.  When a Subscriber-Agent captures the license plate of a Vehicle of Interest that has previously been uploaded to the RMP Database, the Subscriber-Agent is alerted via on-screen and e-mail notification and immediately receives a repossession order authorizing it to repossess the vehicle as an agent of MVRecovery.  Once the Subscriber-Agent successfully repossesses the Vehicle of Interest, the Organization pays a fee to MV and MV, in turn, pays a fee to the Subscriber-Agent.

32.     MVTRAC's ALPR System becomes more attractive to Agent-consumers (and the competitiveness of MVTRAC in the ALPR Technology Market increases) as more Organizations upload their inventory of Vehicles of Interest into the RMP Database, because the more Vehicles of Interest that are in the RMP Database, the more opportunities there are for Subscriber-Agents to complete repossessions through the use of their MV Kits.

**TODD HODNETT (DEFENDANT)**

33.     Hodnett is the Chairman of DRN and the Chief Executive Officer of RDN. Hodnett has participated in and/or authorized other agents and officers of defendants DRN and/or RDN to engage in the wrongful acts described herein.  On information and belief, Hodnett resides in Dallas, Texas.

**JOHNNIE CORT DEHART (DEFENDANT)**

34.     Dehart is the President of DRN and has worked as litigation counsel for RDN. Dehart has participated in and/or authorized other agents and officers of defendants DRN and/or RDN to engage in the wrongful acts described herein.  On information and belief, Dehart resides in Dallas, Texas.

**RECOVERY DATABASE NETWORK, INC. (DEFENDANT)**

35.     Recovery Database Network, Inc. is a Delaware Corporation.  Until at least May 2010, RDN's principle place of business was located at 4100 International Plaza, Suite 2-B10, Fort Worth, Texas, 76109.  RDN has represented that its principle place of business is currently located in Redwood City, California.  However, on information and belief, RDN continues to maintain an office in Fort Worth, Texas and conducts substantial business there.  Like RMP, RDN provides a Recovery Database to Organizations and Agents (the "RDN Database").

36.     RDN is a privately held corporation and, therefore, does not publish information regarding its market share.  However, it is common knowledge within the automotive recovery industry that RDN is by far the largest Recovery Database provider in terms of both the size and number of its subscribers and the amount of revenue and profit that RDN generates.  While certain factual information regarding RDN's market dominance or near-dominance is exclusively within RDN's control and must be obtained through discovery, evidence of RDN's dominance is as follows:

37.     There are less than ten Recovery Database providers in the market place competing with RDN, among them RMP, I-Repo, Reposystems, PRIOS, National Agency Management Systems, and Auto-IMS.  All of RDN's competitors entered the Recovery Database Market subsequent to RDN, after RDN had already cemented relationships with many of the nations' largest auto-finance companies.

38.     RDN's website states that 12 of the top 25 largest automobile lenders in the United States are clients of RDN.  Among those clients are Chase, Capital One, Regional Acceptance Corporation, and US Bank, many of whom use the RDN Database as their sole and

11

exclusive platform for storing and managing data regarding Vehicles of Interest and assign Accounts only to Agents who subscribe to RDN.

39.     RDN's website also states that more than 2,100 Agents subscribe to RDN, including 98 per cent of all members of the four largest recovery industry trade groups (American Recovery Association ("ARA"), National Finance Adjusters ("NFA"), Allied Finance Adjusters, and Time Finance Adjusters ("TFA")).   Since the majority of the largest and most reputable Agents across the United States belong to one or more of these four trade groups, this means that the majority of the largest and most reputable Agents are RDN subscribers.

40.     RDN further reports on its website that, in 2008, it processed over 3,106,790 recovery-related work orders from Agents with subscriptions to RDN.   According to RDN's website, those work orders resulted in approximately 1.3 million repossessions. As a point of comparison, Thomas Webb, chief economist for automobile auction company Manheim, has estimated there were 1.6 million total repossessions nationwide in 2008.

41.     In contrast to RDN, RMP in 2010 had only 290 Agent-subscribers and processed approximately 278,512 recovery related work orders, which resulted in approximately 77,621 repossessions.

42.     On information and belief, a large proportion of RDN's Agent-subscribers use the RDN Database exclusively because (i) RDN provides Agents with a substantial discount if they agree to use the RDN Database as their exclusive workflow software platform of record (and therefore refrain from subscribing to other Recovery Databases); and (ii) many Agents perform repossessions primarily for Organizations that subscribe to RDN.

43.     On April 27, 2005, RDN entered into a Private Label Software Licensing Agreement ("PLSLA," **Exhibit A**) with ARA, the preeminent trade association of auto recovery

professionals in the United States. The PLSA was subsequently amended on April 15, 2007. The PLSLA states that, until April 2012, RDN will offer subscriptions to the RDN Database to ARA members at a discount and integrate RDN software into the ARA website in exchange for the ARA's promise not to enter into any similar agreements with RDN's competitors during the term of the agreement. The PLSLA further states that any similar agreement between ARA and an RDN competitor is grounds for immediate termination of the PLSLA as that would "cause confusion with lending institutions and in the marketplace generally."

44.     On information and belief, RDN has also executed agreements similar to the PLSLA with TFA, NFA, and Recovery Specialist Insurance Group ("RSIG").

45.     On information and belief, RDN's ability to enter into these agreements with ARA, TFA, NFA, and RSIG is evidence of its dominance. On information and belief, the exclusive use and endorsement of RDN by ARA, TFA, NFA, and RSIG, pursuant to the agreements that each has executed, assisted RDN in increasing its number of subscribers, caused RDN to generate increased revenue and profits, and contributed to RDN's ability to achieve and/or maintain dominance or near-dominance in the Recovery Database Market.

46.     In addition, on information and belief, the decision of ARA, TFA, NFA, and RSIG to enter into these agreements with RDN was motivated, in part, by their desire to secure a partnership with and member-discounts from the dominant Recovery Database provider in the industry.

**DIGITAL RECOGNITION NETWORK, INC. (DEFENDANT)**

47.     Defendant Digital Recognition Network, Inc. is a Delaware Corporation with its principal place of business at 4100 International Plaza, Suite 2-B10, Fort Worth, Texas, 76109.

48.     Like MVTRAC, DRN is an ALPR System provider within the ALPR Technology Market.  DRN sells its mobile ALPR Systems ("DRN Kits") to Agents who agree to become "DRN Affiliates" and operate their DRN Kits on the open road a minimum number of hours and/or license plate captures per month.  DRN then collects ALPR data from DRN Affiliates' operation of their DRN Kits and compares this ALPR data against the inventory of Vehicles of Interest in the RDN Database to generate Hits.  DRN sells these Hits to Organizations which, in turn, provide the Hits to their Agents for use in the repossession process.  When an Organization recovers a Vehicle of Interest in part due to a Hit that it purchased from DRN, then DRN, in turn, pays a commission to the DRN Affiliate whose DRN Kit recorded that Hit.

49.     In addition, beginning in December 2009, DRN launched its LPR 2.0 Program, which seeks to mimic the "real-time" nature of MVTRAC's ALPR System as described in paragraph 31 above.  On information and belief, the way LPR 2.0 works is as follows:  DRN forms exclusive partnerships with what are known in the automotive recovery industry as "Forwarding Companies," or intermediary companies that manage Accounts on behalf of Organizations and distribute repossession work to Agents.  These Forwarding Companies then provide DRN with license plate numbers and/or vehicle identification numbers for the Vehicles of Interest that have been assigned to them.  When a DRN Affiliate's DRN Kit "hits" upon a Forwarding Company's Vehicle of Interest, the DRN Affiliate is directed to call a dispatcher. The dispatcher will then authorize the DRN Affiliate to repossess the vehicle if, and only if, the DRN Affiliate will agree to accept a below-market repossession fee set by the Forwarding Company to whom the Vehicle of Interest has been assigned (a fee far below those paid by MVTRAC and numerous other Organizations not affiliated with DRN).  If the DRN Affiliate will not agree to the Forwarding Company's fee schedule, it is not permitted to complete the

repossession and the Account is instead assigned to the closest available DRN Affiliate that has agreed to the Forwarding Company's terms.

50.     DRN is a privately held corporation and, therefore, does not publish information regarding its market share.  However, it is common knowledge within the automotive recovery industry that DRN is by far the largest ALPR Technology provider in terms of both the number of its subscribers and the amount of revenue that it generates.  While certain factual information regarding DRN's market dominance or near-dominance is exclusively within DRN's control and must be obtained through discovery, evidence of DRN's dominance is as follows:

51.     DRN entered the ALPR Technology Market more than a year earlier than any of its competitors, of which there are only three: MVTRAC, Fortum Global, and Reposystems. Therefore, DRN had a substantial head-start in terms of acquiring subscribers (known as "DRN Affiliates") and forming relationships with Organizations who purchase Hits from DRN.

52.     DRN is the only ALPR System provider that has formed a strategic partnership with RDN.

53.     According to a December 2009 article in the Dealer Business Journal, DRN had by the time of publication formed relationships with "11 of the top 25 automotive finance contract originators in the United States."

54.     DRN requires all DRN Affiliates to sign a Master Affiliate Agreement ("MAA"). The MAA prohibits each DRN Affiliate, during the term of the agreement and for 12 months thereafter, from being an "owner, user, supplier, employee, agent, or otherwise associated with" any of DRN's competitors in the ALPR Technology Market (the "Exclusivity Provision").  The MAA also provides that any DRN Affiliate who breaches the Exclusivity Provision shall be liable to DRN for $250,000 in liquidated damages.

55.     Due to the Exclusivity Provision in the MAA, DRN Affiliates who wish to switch to another ALPR Technology provider, or to utilize multiple ALPR Systems at once, are unable to do so.  On information and belief, the Exclusivity Provision in the MAA has helped DRN to achieve and maintain its dominance or near-dominance in the ALPR Technology Market.

56.     On April 17, 2009, DRN and ARA entered into a "Marketing Agreement" ("MA," **Exhibit B**).  The MA requires ARA to "promote and market [DRN] to the exclusion of all other [A]LPR service providers not owned by or affiliated with DRN."  This agreement also requires ARA to distribute DRN promotional materials at all trade shows and conferences and to provide DRN with exhibition space at those events free of charge.

57.     In addition, on July 21, 2009, DRN and ARA entered into a "Preferred Provider Agreement" ("PPA," **Exhibit C**), containing the following terms:

- ARA advanced $365,850 to DRN (the "DRN Advance");

- ARA guaranteed to DRN that ARA members would purchase 130 DRN Kits (generating revenue to DRN of $731,700) over a six-month period;

- ARA agreed that if its members purchased less than 130 DRN Kits within the six-month window, ARA would pay to DRN $250 for each DRN Kit purchased and waive repayment of up to 15 per cent of the DRN Advance (for example, if ARA members purchased only 100 DRN Kits, DRN would never have to repay $79,877.50 of the DRN Advance); and

- During the three-year term of the agreement, ARA promised not to "own, develop, promote, endorse or market" any of DRN's competitors.

58.     On information and belief, DRN induced certain members of the ARA Executive Board to cause ARA to enter into the PPA by partnering on favorable terms with and/or agreeing

16

to provide free or reduced-cost goods and/or services to at least one automotive debt portfolio company and at least one Forwarding Company in which those ARA Board Members have a substantial financial interest.

59.     On information and belief, ARA's exclusive endorsement of DRN and its commitments to DRN pursuant to the MA and PPA as described above have assisted DRN in increasing its number of DRN Affiliates, caused DRN to generate increased revenue and profits, and contributed to DRN's ability to achieve and/or maintain dominance or near-dominance in the ALPR Technology Market.

**SUBSTANTIAL CIRCUMSTANTIAL EVIDENCE EXISTS THAT DEFENDANTS HAVE ACTED IN CONCERT WITH RESPECT TO ALL UNLAWFUL CONDUCT DESCRIBED HEREIN**

60.     While certain evidence is within defendants' exclusive control and cannot be obtained prior to discovery, set forth below is a sampling of circumstantial evidence, gathered to date, which raises a strong inference that defendants performed the wrongful acts ascribed to each of them pursuant to an unlawful agreement or conspiracy:

**A.      RDN and DRN were Founded as a Joint-Venture, Continue to Have Overlapping Management, and Cross-Market and Sell Each Others' Products for Their Mutual Benefit.**

61.     DRN was originally founded as a joint venture with RDN in approximately June 2008. DRN and RDN were operated as a singular enterprise until DRN was converted into a stand-alone corporation in approximately December 2008. From approximately 2008 through at least May 2010, DRN and RDN shared a common phone number and business address in Fort Worth, Texas.

62.     Since its inception, DRN has shared common officers and/or directors with RDN. For example, defendant Hodnett is both Chairman of DRN and the Chief Executive Officer of RDN. Likewise, Jeff Koistinen is a Founder and Vice President of RDN and a Co-Founder and

17

Director of DRN.  *See* LinkedIn Profiles, **Exhibit D**.  While plaintiff cannot ascertain prior to discovery the total number of directors on RDN's and DRN's respective boards, Hodnett, and Dehart are widely known within the automotive recovery industry as the "faces" of RDN and DRN, and are perceived by Agent-consumers in the relevant markets as effectively controlling the decision making of both DRN and RDN.

63.    For example, in the March 2010 issue of trade publication SubPrime Auto Finance News, DRN and RDN are listed as a unit on a list of the "Top Subprime Auto Companies," with Hodnett and Dehart listed as points of contact for both companies under a single phone number.  **Exhibit E**.

64.    Defendant Dehart, who acts as DRN's president, is also an attorney licensed in the state of Texas, and represented RDN in the lawsuit *RDN v. Lovelace*, et al., Cause No. 067-217965-06, in the District Court of Tarrant County, Texas.

65.    DRN and RDN advertise themselves as "sister companies" and "strategic partners."  Marketing Materials, **Exhibit  F.**

66.    RDN advertises DRN's products on its website and solicits consumers to contact RDN to obtain more information about becoming a DRN customer.   Screenshot, **Exhibit G**.

67.    DRN and RDN run joint promotions whereby consumers receive discounts for purchasing the products of one company if they also purchase or are already using the products of the other company.  DRN Press Releases, **Exhibit H**.

68.    The public websites for RDN and DRN are nearly identical in organization, structure, and appearance.  Screenshots, **Exhibit I**.

69.    RDN and DRN send joint e-mails soliciting Agents to purchase Hits on behalf of the Organizations for whom the Agents work.  These e-mails are sent from Hodnett's RDN e-

mail address, and are "signed" by both "DRN Dispatch" and "RDN Sales" with a common telephone number listed for both entities.  *See, e.g.,* July 2009 Hodnett E-mail, **Exhibit J**.  On information and belief, RDN receives a portion of the revenue from Hits sold as a result of these joint e-mails.

70.     It is apparent, based on the facts alleged above in paragraphs 60 through 69, that DRN and RDN have overlapping financial interests and benefit from each other's ability to achieve and maintain dominance in its respective market.  The more Organizations and Agents who subscribe to RDN, the bigger the pool of customers to whom DRN and RDN can sell Hits. The more Agents that become DRN Affiliates and capture ALPR Data for DRN, the more Hits RDN and DRN can generate and sell.

**B.**     **DRN Uses the Threat of Exclusion from the RDN Database to Dissuade DRN Affiliates from Doing Business with Competitors of DRN.**

71.     DRN has threatened to terminate DRN Affiliates' access to *both* DRN and RDN if they violate the MAA, or if they allow companies with whom they are affiliated (but who themselves have not signed the MAA) to do business with DRN competitors.

72.     DRN's representations to DRN Affiliates that DRN is able to exclude them from the RDN Database raises an inference that DRN exercises control over RDN and that RDN is willing to lose customers for the purpose of assisting DRN in stifling competition in the ALPR Technology Market.

**C.**     **RDN has Excluded Agents from Using the RDN Database for the Purpose of Assisting DRN in Restricting Competition in the ALPR Technology Market.**

73.     Since November 2009, and coinciding with MVTRAC's entry into the ALPR Technology Market, RDN has excluded MVRecovery and MVIntel (both of which subscribed to

RDN since at least 2003 and paid substantial fees to RDN) from accessing the RDN Database. RDN's exclusion of MVRecovery and MVIntel cost MV hundreds of thousands of dollars in lost revenue from Accounts to which MV was or would have been assigned by Organizations requiring MV to use RDN.  RDN refused to reinstate MV's access to the RDN Database even though MV was willing to continue paying the going rate for access and even after Chase, a prominent client of *both* RDN and MV, pleaded with RDN to reverse course.

74.    RDN prohibits its Agent-subscribers from using the RDN Database to process Accounts that are associated with any ALPR System provider other than DRN.

75.    RDN's decision to turn away substantial business from MV and from other Agent-subscribers wishing to process non-DRN ALPR Accounts on RDN's Recovery Database is against RDN's economic self-interest and raises an inference that RDN has agreed to assist DRN in restricting competition within the ALPR Technology Market.

## COUNT I

### CONSPIRACY TO VIOLATE SECTION 1 OF THE SHERMAN ACT

### (AGAINST ALL DEFENDANTS)

76.    The allegations of paragraphs 1-75 of the Amended Complaint are hereby incorporated by this reference.

77.    Plaintiff MVTRAC and defendant DRN are both in the business of supplying ALPR Systems to Organizations and Agents in the ALPR Technology Market.  DRN has substantial market power in the ALPR Technology Market, as described in paragraphs 47 through 59 above.

78.     Plaintiff RMP and defendant RDN are both in the business of supplying Recovery Databases to Organizations and Agents in the Recovery Database Market.  RDN has substantial market power in the Recovery Database Market, as described in paragraphs 35 through 46 above.

79.     MVTRAC has spent considerable time, money, and effort developing its proprietary ALPR System. That system is comparable or superior in quality to DRN's ALPR System.  MVTRAC seeks to compete with DRN in the ALPR Technology Market.  In order to do so effectively, MVTRAC requires a fair opportunity to compete for potential customers—the Organizations and Agents who utilize or are interested in utilizing an ALPR System in order to locate and recover Vehicles of Interest.

80.     RMP has spent considerable time, money, and effort developing a Recovery Database that is comparable or superior in quality to the RDN Database.  RMP seeks to compete with RDN in the Recovery Database Market.  In order to do so effectively, RMP requires a fair opportunity to compete for potential customers—the Organizations and Agents who utilize or are interested in utilizing a Recovery Database in order to locate and recover Vehicles of Interest.

81.     In or about 2008, DRN and RDN, under the management and direction of Hodnett and Dehart, entered into an unlawful agreement for the purpose of restraining trade in the ALPR Technology Market and Recovery Database Market and maintaining their respective dominance in those markets.

82.     In particular, defendants by themselves and through their officers, agents, salespeople, distributors, representatives, and other persons unknown to plaintiffs at this time, have done the following pursuant to their unlawful agreement:

> a.  DRN has threatened to terminate certain DRN Affiliates' use of DRN **and/or** RDN unless they cause their affiliated companies, who have not contracted with

21

DRN, to cancel their subscriptions with MVTRAC.  As a result, DRN Affiliates who wish to switch to MVTRAC or utilize both DRN and MVTRAC, are discouraged from doing so;

b.  DRN has threatened to terminate DRN Affiliates' access to DRN ***and*** RDN, and to enforce the Exclusivity Provision and liquidated damages provision of the MAA should these DRN Affiliates use an ALPR System other than DRN's, with knowledge that such action would likely have the effect of putting these DRN Affiliates out of business.  As a result, DRN Affiliates who wish to switch to MVTRAC or utilize both DRN and MVTRAC, are discouraged from doing so;

c.  DRN has caused all DRN Affiliates to execute the MAA, which (i) prohibits them from using the services of or even associating with DRN competitors, through the Exclusivity Provision; and (ii) contains prohibitively high liquidated damages provisions that DRN uses to intimidate DRN Affiliates and prevent them from even considering the services of DRN's competitors, including MVTRAC.  As a consequence, MVTRAC is effectively denied access to hundreds of Agents who would use MVTRAC's ALPR System but for the oppressive terms of the MAA. Further, RDN's and DRN's actions have prevented MVTRAC from acquiring a sufficient number of Subscribers to attract large Organizations to do business with MVTRAC and RMP;

d.  RDN prevents its Agent-subscribers from exporting the data they have entered into the RDN Database (such data include information on the debtor-driver, progress notes, invoices, payment records, etc.).  As a result, Agent-subscribers who wish to terminate their subscription with RDN and switch to a competing

Recovery Database are discouraged from doing so, because they fear that RDN will withhold years worth of data necessary to (i) complete the repossession process for their open Accounts; and (ii) maintain the historical records regarding closed Accounts that would be required to back-up tax returns submitted to the Internal Revenue Service.  This fear is well founded.  It is well known in the automotive recovery industry that RDN has on numerous occasions withheld data from Agents and Organizations who sought to switch from RDN to one of RDN's competitors.  RDN's unilateral control over the data of its subscribers restrains competition and harms consumers within the Recovery Database Market, because Agents and Organizations who wish to switch to a competing Recovery Database that may be cheaper and/or superior to RDN are unable to do so;

e.   Recently, RDN has begun blocking its Agent-subscribers from using RDN to process Accounts that are associated with any ALPR System provider other than DRN, such as MVTRAC.  RDN's refusal to allow Agents to use RDN to process non-DRN Accounts discourages Agents (who in many cases must subscribe to RDN in order to accept Accounts from their largest Organization-clients) from becoming customers of MVTRAC, and unreasonably restrains competition in the ALPR Technology Market.  RDN's refusal to allow Agent-subscribers to process MVTRAC Accounts on RDN increases costs to consumers. If an Agent-subscriber accepts Accounts from both MVTRAC and other Organizations who require the Agent to process their Accounts in RDN, the Agent must either (i) forgo the opportunity to earn revenue from MVTRAC; or (ii) subscribe to both RDN and an additional Recovery Database that does not prohibit processing of

MVTRAC Accounts.  Agents will then be forced to pass on that additional cost to Organizations who, in turn, will increase the cost of auto-financing to consumers at large;

f.   From at least 2003 until November 22, 2009, RDN permitted MVRecovery and MVIntel to utilize the RDN Database for the management of their Accounts and to communicate with the Organizations with which they do business.   On November 23, 2009, just as MVTRAC was entering the ALPR Technology Market, RDN terminated MV's access to RDN.  RDN refused to reinstate MV's access to RDN even though MV had been and was willing to continue paying the going rate for access, and even after Chase, one of RDN's largest Organization clients, pleaded with RDN to do so.  RDN's exclusion of MVRecovery and MVIntel caused MV to lose substantial existing and future business from many large Organizations (e.g., Chase, BMW Financial, Capital One, Credit Acceptance, Westlake Financial) which require all Agents with whom they work to use the RDN Database.  Because the denial of access to RDN meant that MVTRAC could no longer accept Accounts from those Organizations, MVTRAC's inventory of Accounts dropped significantly.  As a consequence, MVTRAC (and MVTRAC's Agent-subscribers who recover Vehicles of Interest on MV's behalf) have lost significant revenue and MVTRAC's ALPR System is less competitive than it otherwise would be, to the detriment of MV and all consumers in the ALPR Technology Market;

g.   In addition to prohibiting MV from accessing RDN, RDN refused to return to MV the data that MV had stored on the RDN Database.  MV owns that data, and had

invested substantial resources to acquire it over a multi-year period. As a result of RDN's refusal to return the data to MV, MV was unable to complete many of its pre-existing recovery assignments and lost substantial revenue that it otherwise would have earned;

h.  RDN's termination of MV's access to the RDN Database also caused MV to bear the increased costs required to interface its system with an alternative database, the RMP Database, on an accelerated basis;

i.  Since at least June 2009, DRN has been withholding commissions due under the MAA to DRN Affiliates who have refused to sign agreements with the Forwarding Companies with whom DRN has partnered. Further, in breach of the MAA, DRN has begun restricting DRN Affiliates from accessing their own ALPR Data that is more than thirty days old, thereby diminishing the value of the DRN Affiliates' DRN Kits. However, DRN Affiliates believe they are unable to enforce their rights under the MAA and/or terminate their relationship with DRN because (i) they are much smaller than and have inferior bargaining power to DRN; (ii) they fear that DRN will retaliate against them by shutting off their DRN Kits and/or terminating their access to the RDN Database; and (iii) cutting ties with DRN would cause these DRN Affiliates to forfeit the substantial investment they made in purchasing DRN Kits. As a result, DRN Affiliates who otherwise would not repossess cars for the Forwarding Companies' below-market fees have been forced to do so, thereby injuring Agent-consumers in the ALPR Technology Market;

j.   In order for a company to compete successfully in the ALPR Technology Market, it must be able to promote its ALPR System to the ARA general membership, which includes the largest and most reputable Agents across the United States, and those most likely to purchase and operate ALPR Systems.  On information and belief, defendants have persuaded the ARA to promote RDN and DRN to the exclusion of their competitors (as described in paragraphs 43, 56, and 57 above), by partnering on favorable terms with and/or providing free or discounted goods and/or services to at least one automotive debt portfolio company and at least one Forwarding Company in which certain ARA Directors have a substantial financial interest.   These companies include Genco Recovery and All Technology Recovery;

k.   As a result of the exclusive and anti-competitive agreements between and among the ARA, RDN, and DRN as described in paragraphs 43, 56, and 57 above, ARA has (i) heavily promoted DRN and RDN to the exclusion of other providers of ALPR Systems and Recovery Databases, including MVTRAC and RMP; (ii) spent substantial member-supplied ARA funds for the benefit of DRN; and (iii) increased the cost to plaintiffs of competing with DRN and RDN for business from ARA members, thereby driving up the prices that ARA members must pay for alternatives to DRN's and RDN's products;

l.   As a further result of DRN's and RDN's close relationship and their agreements with ARA, and the substantial influence that DRN and RDN exert over ARA and, in particular, over certain members of the ARA Executive Board, ARA revoked MVTRAC's permission to participate as a vendor at the ARA 2010 North

American Repossessors Summit in Dallas, Texas (the "Summit"), forfeiting the substantial entrance fee that MVTRAC had paid. The Summit, which is open not only to ARA members but all recovery professionals nationwide, is the largest and most influential trade show of its kind in the United States, which many of MV's customers and potential customers attended, and at which DRN and RDN were prominently showcased.   Because MVTRAC was prohibited from participating in the Summit, it was forced to hold a separate promotional event in close proximity to the Summit, which cost MV nearly ten times the amount it would have spent to participate as a vendor at the Summit;

m.  In addition, on information and belief, as a result of DRN's and RDN's substantial influence over certain ARA Board Members, whose companies receive substantial benefits from DRN, ARA denied MV's request, in October 2009, to change its Chicago listing in the ARA Directory from City Auto Recovery Services to MVRecovery, despite the fact that (i) both names are registered with the Illinois Secretary of State as belonging to MVCONNECT, LLC; and (ii) the ARA By-Laws do not prohibit the requested name change. While ARA eventually reversed course when MV threatened to take legal action, MV was temporarily unable to effectively advertise MVRecovery's services to Organizations through the ARA Directory, forcing MV to spend additional funds to raise awareness of its brand through other means;

n.  RDN has retaliated against RDN subscribers who also use competitors' Recovery Databases by increasing the fees these subscribers must pay to continue accessing the RDN Database and thereby unfairly discouraging other RDN subscribers from

doing business with RDN's competitors, including RMP.  As a result, RDN Subscribers who wish to switch to RMP or utilize both RDN and RMP, are discouraged from doing so;

o.  DRN has retaliated against former DRN Affiliates who returned their DRN Kits to DRN and switched to MVTRAC, by breaching promises to refund amounts due these DRN Affiliates under their contracts for the DRN Kits.  As a result, DRN Affiliates who wish to switch from DRN to MVTRAC are further discouraged from doing so;

p.  DRN directed its representatives to place repeated phone calls to a DRN Affiliate who is operating an MV Kit.  These DRN representatives asked whether the DRN Affiliate was a customer of MVTRAC, but hung up the phone when the DRN Affiliate requested that they identify themsevles.  This DRN Affiliate has reported that, subsequent to receiving these phone calls, his DRN Kit ceased working and DRN customer service representatives refused to assist him, stating only that he must "speak with upper management;"

q.  On information and belief, all the actions of DRN and RDN described above were taken under the direct management, supervision, and control of Hodnett and Dehart.

83.  All conduct described above was taken pursuant to a conspiracy, plan, and scheme between and among defendants that was intended to damage MV and RMP and harm competition in the relevant markets.

84.  Defendants' conspiracy, plan and scheme as described above have had the direct and proximate result of: (i) substantially raising plaintiffs' costs to promote and provide their

goods and services to their customers; and (ii) preventing plaintiffs from doing business with Organizations and Agents who would become customers of plaintiffs but for defendants' actions.

85.    As a further direct and proximate result thereof, competition in the ALPR Technology Market and in the Recovery Database Market has been significantly harmed, enabling RDN and DRN to maintain their market power in those markets, and injuring plaintiffs and consumers in those markets.

86.    This wrongful conspiracy, plan, and scheme, and the acts taken in pursuit thereof, constitute an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act (15 U. S. C. § 1).

WHEREFORE, plaintiffs pray that the Court grant them the following relief:

a)    a preliminary injunction enjoining defendants from repetition of acts similar to the wrongful acts described above;

b)    a permanent injunction forever prohibiting defendants and each of them from repetition of acts similar to the wrongful acts described above;

c)    threefold the damages sustained by each plaintiff as a result of the violations of the antitrust laws, pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15);

d)    the costs of this suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15); and

e)    such other relief as the Court deems equitable and proper.

## COUNT II

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT: MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

### (AGAINST DEFENDANTS DRN, HODNETT, AND DEHART)

87.     The allegations of paragraphs 1-86 of the Amended Complaint are hereby incorporated by this reference.

88.     DRN is the dominant provider of ALPR Systems in the ALPR Technology Market.  MVTRAC is a rival of DRN in the ALPR Technology Market.

89.     By and through the wrongful acts of DRN, taken under the direct supervision and control of Hodnett and Dehart, as described in paragraph 82 above (and, in particular, in sub-paragraphs 82(a)(b)(c)(i)(j)(k)(l)(m)(o) and (p)), DRN has monopolized or has attempted to monopolize the ALPR Technology Market.

90.     As a result of DRN's monopolization or attempted monopolization of the ALPR Technology Market, MVTRAC has been prevented from competing in the ALPR Technology Market, to the detriment of MV and to the consumers in that market—all Organizations and Agents who wish to utilize one or more ALPR Systems in their effort to locate and recover Vehicles of Interest.

91.     DRN's conduct has (i) discouraged and prevented Agent-consumers from becoming MVTRAC subscribers; (ii) discouraged and prevented Organizations from assigning Accounts to MVTRAC; and (iii) discouraged and prevented industry trade associations from partnering with MV.  This represents not only a loss of choice to consumers, but it also reduces the efficiency and attractiveness of MVTRAC's ALPR System, which becomes more effective and attractive as the number of MV Kits on the road increases. This, in turn, harms Organizations who are using or who wish to use MVTRAC to recover their Vehicles of Interest,

as the number of Vehicles of Interest that MVTRAC is able to recover is artificially depressed. Ultimately, the harm flows to automobile consumers generally—if the cost to Organizations of recovering collateral is artificially inflated, Organizations will pass that cost along to consumers in the form of increased interest rates for auto loans.

92.     DRN's actions described above constitute monopolization or attempted monopolization in the ALPR Technology Market, in violation of Section 2 of the Sherman Act (15 U. S. C. § 2).

WHEREFORE, plaintiff MVCONNECT, LLC prays that the Court grant it the following relief:

a)  a preliminary injunction enjoining DRN, Hodnett and Dehart from repetition of acts similar to the wrongful acts described above;

b)  a permanent injunction forever prohibiting DRN, Hodnett and Dehart from repetition of acts similar to the wrongful acts described above;

c)  threefold the damages it has sustained by reason of the violations of the antitrust laws pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15);

d)  the costs of this suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15); and

e)  such other relief as the Court deems equitable and proper.

## COUNT III

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT:
### MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

### (AGAINST DEFENDANTS RDN AND HODNETT)

93.     The allegations of paragraphs 1-92 of the Amended Complaint are hereby incorporated by this reference.

94.     RDN is the dominant Recovery Database provider in the Recovery Database Market.  RMP is a rival of RDN in the Recovery Database Market.

95.     By and through the wrongful acts of RDN, taken under the direct supervision and control of Hodnett, as described in paragraph 82 above (and, in particular, in sub-paragraphs 82(d)(k) and (n)), RDN has monopolized or has attempted to monopolize the Recovery Database Market.

96.     As a result of RDN's monopolization or attempted monopolization of the Recovery Database Market, RMP has been prevented from competing in the Recovery Database Market, to the detriment of RMP and to the consumers in that market—all Organizations and Agents who wish to utilize one or more Recovery Databases in their effort to locate and recover Vehicles of Interest.

97.     RDN's conduct has (i) discouraged and prevented Agent-consumers from becoming RMP subscribers; (ii) discouraged and prevented Organizations from assigning Accounts to Agents through RMP; and (iii) discouraged and prevented industry trade associations from partnering with RMP.  This represents a loss of choice to consumers and injures consumers in the Recovery Database Market.

98.     RDN's actions described above constitute monopolization or attempted monopolization in the ALPR Technology Market, in violation of Section 2 of the Sherman Act (15 U. S. C. § 2).

WHEREFORE, plaintiff Recovery Manager Pro, LLC prays that the Court grant it the following relief:

a)  a preliminary injunction enjoining RDN and Hodnett from repetition of acts similar to the wrongful acts described above;

b)  a permanent injunction forever prohibiting RDN and Hodnett from repetition of acts similar to the wrongful acts described above;

c)  threefold the damages it has sustained by reason of the violations of the antitrust laws pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15);

d)  the costs of this suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15); and

e)  such other relief as the Court deems equitable and proper.

## COUNT IV

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT: CONSPIRACY TO MONOPOLIZE

### (AGAINST ALL DEFENDANTS)

99.     The allegations of paragraphs 1-98 of the Amended Complaint are hereby incorporated by this reference.

100.    RDN is the dominant provider of recovery databases in the Recovery Database Market.  RMP is a rival of RDN in the Recovery Database Market.

101.    DRN is the dominant provider of an ALPR System in the ALPR Technology Market.  MVTRAC is a rival of DRN in the ALPR Technology Market.

102.     By and through their collective actions as described in paragraph 82 above and elsewhere herein, and under the management and control of Hodnett and Dehart, RDN and DRN have conspired to monopolize the ALPR Technology Market and Recovery Database Market.

103.     Defendants' conspiracy, plan, and scheme as described above has (i) discouraged and prevented Agent-consumers from becoming MVTRAC and/or RMP subscribers; (ii) discouraged and prevented Organizations from assigning Accounts to MVTRAC; (iii) discouraged and prevented Organizations from assigning Accounts to Agents through the RMP Database; and (iv) discouraged and prevented industry trade associations from partnering with MVTRAC and/or RMP.  Accordingly, as a result of defendants' conspiracy, plan, and scheme as described above, plaintiffs have been prevented from competing in their respective markets, to the detriment of plaintiffs and of consumers in those markets—all Organizations and Agents who wish to utilize one or more Recovery Databases and/or one or more ALPR Systems in their effort to locate and recover Vehicles of Interest.

104.     Defendants' actions as described above constitute a conspiracy to monopolize in violation of Section 2 of the Sherman Act (15 U. S. C. § 2).

WHEREFORE, plaintiffs pray that the Court grant them the following relief:

a)  a preliminary injunction enjoining defendants from repetition of acts similar to the wrongful acts described above;

b)  a permanent injunction forever prohibiting defendants from repetition of acts similar to the wrongful acts described above;

c)  threefold the damages they each, respectively, have sustained by reason of the violations of the antitrust laws pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15);

34

d) the costs of this suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act (15 U. S. C. § 15); and

e) such other relief as the Court deems equitable and proper.

## COUNT V

### CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

105.    The allegations of paragraphs 1-104 of the Amended Complaint are hereby incorporated by this reference.

106.    Plaintiffs have spent considerable time, money, and effort developing good will with the various Organizations and Agents with whom they conduct business and endeavor to conduct business. As a result of these efforts, plaintiffs have developed excellent reputations and good will among the various Organizations and Agents throughout the United States that are their established customers and prospective customers.

107.    As described above, defendants RDN and DRN are closely affiliated entities under the overlapping management, supervision, direction, and control of Hodnett and Dehart.

108.    Since at least 2007, defendants have been engaged in a conspiracy, plan and scheme to destroy plaintiffs and force them out of the automotive recovery industry, as described in Counts I through IV above.

109.    In addition to defendants' actions being unlawful under the federal antitrust laws, these actions also were taken for the express purpose and had the effect of tortiously interfering with plaintiffs' pre-existing and prospective business relationships.

110.    Defendants' unlawful and malicious conduct as described above has proximately resulted in plaintiffs' loss of numerous lucrative contractual relationships with Organizations and Agents, which, but for defendants' willful and malicious interference, would still exist today.

111.    Further, defendants' unlawful and malicious conduct as described above has prevented plaintiffs from forming numerous new business relationships with Organizations and Agents.   Plaintiffs were reasonably certain to form these business relationships but for defendants' unlawful interference.  Defendants engaged in the unlawful conduct described above with the conscious desire to prevent MV and RMP from forming these additional business relationships.

112.    The collective wrongful acts undertaken by defendants as described herein have irreparably harmed plaintiffs in that they have had the effect of diminishing plaintiffs' reputations and goodwill in the automotive recovery industry, have thwarted plaintiffs' ability to grow their respective businesses, and have caused plaintiffs to lose numerous pre-existing and prospective customers, and millions of dollars in revenue.  Plaintiffs will suffer further damage and irreparable injury unless and until defendants are enjoined by this Court from continuing with their tortious conduct.

113.    By reason of the wrongful and malicious conduct of defendants, plaintiffs are entitled to recover actual and exemplary damages from defendants.

WHEREFORE, plaintiffs pray that the Court grant them the following relief:

a)  a preliminary injunction enjoining defendants from repetition of acts similar to the wrongful acts described above;

b)  a permanent injunction forever prohibiting defendants from repetition of acts similar to the wrongful acts described above;

c)  a money judgment against defendants for that amount of ordinary damages which the evidence shows that MV and RMP, respectively, have suffered as a result of the

wrongful acts alleged herein and for exemplary damages in excess of $10 million;
and

d)   such other relief as the Court deems equitable and proper.

## COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST DEFENDANTS DRN, DEHART AND HODNETT

### (IN THE ALTERNATIVE)

114.    The allegations of paragraphs 1-104 of the Amended Complaint are hereby incorporated by this reference.

115.    Count VI is alleged in the alternative to Count V.

116.    The unilateral actions of DRN as described in paragraph 82 above (and, in particular, in sub-paragraphs 82(a)(b)(c)(i)(j)(k)(l)(m)(o) and (p)), taken under the close supervision, direction, and control of Hodnett and Dehart, were for the purpose and had the effect of tortiously interfering with plaintiffs' pre-existing contractual relationships.

117.    DRN's unlawful and malicious conduct as described above has proximately resulted in plaintiffs' loss of numerous lucrative contractual relationships with Organizations and Agents, which, but for defendants' willful and malicious interference, would still exist today.

118.    The wrongful actions of DRN as described herein, taken under the close supervision, direction, and control of Hodnett and Dehart, have irreparably harmed plaintiffs by diminishing plaintiffs' reputation and goodwill in the automotive recovery industry, have thwarted plaintiffs' ability to grow their businesses, and have caused plaintiffs to lose numerous pre-existing and prospective customers, and millions of dollars in revenue.  Plaintiffs will suffer further damage and irreparable injury unless and until DRN, Hodnett and Dehart are enjoined by this Court from continuing with their tortious conduct.

119.   By reason of the wrongful and malicious conduct of DRN, Hodnett and Dehart, plaintiffs are entitled to recover actual and exemplary damages.

WHEREFORE, plaintiffs pray that the Court grant it the following relief:

a)   a preliminary injunction enjoining DRN, Hodnett and Dehart from repetition of acts similar to the wrongful acts described above;

b)   a permanent injunction forever prohibiting DRN, Hodnett and Dehart from repetition of acts similar to the wrongful acts described above;

c)   a money judgment against DRN, Hodnett and Dehart for that amount of ordinary damages which the evidence shows that MV and RMP, respectively, have suffered as a result of the wrongful acts alleged herein and for exemplary damages in excess of $10 million; and

d)   such other relief as the Court deems equitable and proper.

## COUNT VII

### TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST DEFENDANTS RDN AND HODNETT

### (IN THE ALTERNATIVE)

120.   The allegations of paragraphs 1-104 of the Amended Complaint are hereby incorporated by this reference.

121.   Count VII is alleged in the alternative to Count V.

122.   The unilateral actions of RDN as described in paragraph 82 above (and, in particular, sub-paragraphs 82(d)(e)(f)(g)(h)(j)(k)(l)(m) and (n)), taken under the close supervision, direction, and control of Hodnett, were for the purpose and had the effect of tortiously interfering with plaintiffs' pre-existing contractual relationships.

38

123.    RDN's unlawful and malicious conduct as described above has proximately resulted in plaintiffs' loss of numerous lucrative contractual relationships with Organizations and Agents, which, but for defendants' willful and malicious interference, would still exist today.

124.    The wrongful actions of RDN as described herein, taken under the close supervision, direction, and control of Hodnett, have irreparably harmed plaintiffs in that they have had the effect of diminishing plaintiffs' reputation and goodwill in the automotive recovery industry, have thwarted plaintiffs' ability to grow their businesses, and have caused plaintiffs to lose numerous pre-existing and prospective customers, and millions of dollars in revenue. Plaintiffs will suffer further damage and irreparable injury unless and until RDN and Hodnett are enjoined by this Court from continuing with their tortious conduct.

125.    By reason of the wrongful and malicious conduct of RDN and Hodnett, plaintiffs are entitled to recover actual and exemplary damages.

WHEREFORE, plaintiffs pray that the Court grant it the following relief:

a)  a preliminary injunction enjoining RDN and Hodnett from repetition of acts similar to the wrongful acts described above;

b)  a permanent injunction forever prohibiting RDN and Hodnett from repetition of acts similar to the wrongful acts described above;

c)  a money judgment against RDN and Hodnett for that amount of ordinary damages which the evidence shows that plaintiffs have each, respectively, suffered as a result of the wrongful acts alleged herein and for exemplary damages in excess of $10 million; and

d)  such other relief as the Court deems equitable and proper.

## COUNT VIII

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS AGAINST DEFENDANTS DRN, HODNETT AND DEHART

### (IN THE ALTERNATIVE)

126.    The allegations of paragraphs 1-104 of the Amended Complaint are hereby incorporated by this reference.

127.    Count VIII is alleged in the alternative to Count V.

128.    The unilateral actions of DRN as described in paragraph 82 above (and, in particular, in sub-paragraphs 82(a)(b)(c)(i)(j)(k)(l)(m)(o) and (p)), taken under the close supervision, direction, and control of Hodnett and Dehart, were for the purpose and had the effect of tortiously interfering with plaintiffs' prospective business relationships.

129.    As a proximate result of DRN's unlawful and malicious actions as described herein, taken under the close supervision, direction, and control of Hodnett and Dehart, plaintiffs have been precluded from forming numerous new business relationships with Organizations and Agents.

130.    Plaintiffs were reasonably certain to form these business relationships but for DRN's unlawful interference.

131.    DRN, Hodnett, and Dehart engaged in the unlawful and malicious conduct described above with a conscious desire to prevent plaintiffs from forming these business relationships.   Alternatively, DRN, Hodnett, and Dehart knew it was certain or substantially certain that its conduct as described above would interfere with plaintiffs' business relationships.

132.    The wrongful acts undertaken by DRN as described herein have irreparably harmed plaintiffs in that they have had the effect of diminishing plaintiffs' reputations and goodwill in the automotive recovery industry, have thwarted plaintiffs' ability to grow their

respective businesses, and have caused plaintiffs to lose numerous pre-existing and prospective customers, and millions of dollars in revenue.   Plaintiffs will suffer further damage and irreparable injury unless and until DRN, Hodnett, and Dehart are enjoined by this Court from continuing with their tortious conduct.

133.   By reason of the wrongful and malicious conduct of DRN, Hodnett and Dehart, plaintiffs are entitled to recover actual and exemplary damages.

WHEREFORE, plaintiffs pray that the Court grant them the following relief:

a)   a preliminary injunction enjoining DRN, Hodnett and Dehart from repetition of acts similar to the wrongful acts described above.

b)   a permanent injunction forever prohibiting DRN, Hodnett and Dehart from repetition of acts similar to the wrongful acts described above.

c)   a money judgment against DRN, Hodnett and Dehart for that amount of ordinary damages which the evidence shows that plaintiffs have suffered as a result of the wrongful acts alleged herein and for exemplary damages in excess of $10 million.

d)   such other relief as the Court deems equitable and proper.

## COUNT IX

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS AGAINST DEFENDANTS RDN AND HODNETT

### (IN THE ALTERNATIVE)

134.   The allegations of paragraphs 1-104 of the Amended Complaint are hereby incorporated by this reference.

135.   Count IX is alleged in the alternative to Count V.

136.   The unilateral actions of RDN as described in paragraph 82 above (and, in particular, sub-paragraphs 82(d)(e)(f)(g)(h)(j)(k)(l)(m) and (n)), taken under the close

41

supervision, direction and control of Hodnett, were for the purpose and had the effect of tortiously interfering with plaintiffs' prospective business relationships.

137.    As a proximate result of RDN's unlawful and malicious conduct as described, plaintiffs have been precluded from forming numerous new business relationships with Organizations and Agents.

138.    Plaintiffs were reasonably certain to form these business relationships but for RDN's unlawful interference.

139.    RDN and Hodnett engaged in the unlawful and malicious conduct described above with a conscious desire to prevent plaintiffs from forming these business relationships. Alternatively, RDN and Hodnett knew it was certain or substantially certain that their conduct as described above would interfere with plaintiffs' business relationships.

140.    The wrongful acts undertaken by RDN as described herein have irreparably harmed plaintiffs in that they have had the effect of diminishing plaintiffs' reputations and goodwill in the automotive recovery industry, have thwarted plaintiffs' ability to grow their respective businesses, and have caused plaintiffs to lose numerous pre-existing and prospective customers, and millions of dollars in revenue.   Plaintiffs will suffer further damage and irreparable injury unless and until RDN and Hodnett are enjoined by this Court from continuing with its tortious conduct.

141.    By reason of the wrongful and malicious conduct of RDN and Hodnett, plaintiffs are entitled to recover actual and exemplary damages.

WHEREFORE, plaintiffs pray that the Court grant them the following relief:

a)   a preliminary injunction enjoining RDN and Hodnett from repetition of acts similar to the wrongful acts described above;

b)   a permanent injunction forever prohibiting RDN and Hodnett from repetition of acts similar to the wrongful acts described above;

c)   a money judgment against RDN and Hodnett for that amount of ordinary damages which the evidence shows that plaintiffs have suffered as a result of the wrongful acts alleged herein and for exemplary damages in excess of $10 million; and

d)   such other relief as the Court deems equitable and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.


Respectfully submitted,

**MVCONNECT, LLC and
RECOVERY MANAGER PRO, LLC**

By: /s/ Peter M. Spingola
      One of Their Attorneys

Robert A. Chapman (ARDC No. 6191210)
Peter M. Spingola (ARDC No. 6243942)
Sara Siegall (ARDC No. 6297622)
**CHAPMAN SPINGOLA, LLP**
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601
312/606-8754 (phone)
312/630-9233 (fax)
pspingola@chapmanspingola.com
*Lead Counsel*

Gina Viccinelli
State Bar No. 24013685
Kenneth Riney
State Bar No. 24046721
**HERMES SARGENT BATES, LLP**
901 Main Street, Suite 5200
Dallas, Texas 75202
214-749-6544 (phone)
214-749-6344 (fax)
Gina.Viccinelli@hsblaw.com
*Local Counsel*

## **CERTIFICATE OF SERVICE**

I, Peter Spingola, an attorney, hereby certify that on January 20, 2011, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF electronic filing system, which will send a notice of electronic filing to counsel of record.


/s/ Peter M. Spingola